Filed 8/16/24  P. v. Garcia CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>JAVIER RUBEN RODRIGUEZ GARCIA,<br><br>　　Defendant and Appellant. | H050818<br>(Santa Clara County<br>Super. Ct. No. C1247403) |

In June 2016, a jury found defendant Javier Ruben Rodriguez Garcia guilty of six crimes, including first degree felony murder (Pen. Code, § 187[1]), related to a home invasion robbery.  The jury deadlocked on a robbery-murder special circumstance allegation that Garcia acted with reckless indifference to human life and was a major participant in the crime (§ 190.2, subds. (a)(17), (d)).  The trial court sentenced Garcia to 25 years to life for his murder conviction, consecutive to 12 years for his other crimes and a prior prison term enhancement (§ 667.5, former subd. (b)).

In March 2020, on direct appeal, this court reversed the judgment and remanded with directions concerning the prior prison term enhancement and Garcia's eventual

---

[1] Unspecified statutory references are to the Penal Code.

youth offender parole hearing.  We otherwise affirmed Garcia's convictions.  (See *People v. Garcia* (2020) 46 Cal.App.5th 123, 182 (*Garcia*).[2])

In September 2021, Garcia filed a petition in the trial court to vacate his murder conviction and be resentenced under former section 1170.95 (now section 1172.6) (petition).  Following an evidentiary hearing based on the trial transcripts and exhibits, the trial court denied Garcia's petition.  The court found Garcia ineligible for relief because he was a major participant in the underlying felony who acted with reckless indifference to human life.  The court also found that the implicit dismissal of the robbery-murder special circumstance allegation after the jury's deadlock did not preclude the district attorney from proving Garcia's ineligibility for relief.

In this appeal, Garcia contends the trial court erred by concluding there was sufficient evidence proving he was a major participant who acted with reckless indifference to human life.  Garcia further contends the trial court erred by rejecting his argument that the jury's deadlock on the special circumstance allegation and the district attorney's subsequent failure to pursue the allegation collaterally estopped the district attorney from contesting the petition.

For the reasons explained below, we affirm the trial court's order denying Garcia's petition.

## I.  FACTS AND PROCEDURAL BACKGROUND[3]

### A.  *Information*

"In September 2014, the Santa Clara County District Attorney filed an information charging Garcia and Austin with six counts related to the November 2012 home invasion

[2] On our own motion, we take judicial notice of our records in Garcia's direct appeal (No. H043870), including our prior opinion.

[3] We derive our recitation of the procedural history of Garcia's 2016 trial from our prior opinion, but our factual recitation is based on the trial transcripts admitted at Garcia's section 1172.6 evidentiary hearing.  (See *People v. Clements* (2022) 75 Cal.App.5th 276, 292 (*Clements*).)  At trial, a single jury heard evidence regarding Garcia and his codefendant DeAngelo Joseph Austin.  (*Garcia*, *supra*, 46 Cal.App.5th at p. 130.)

2

robbery of Raveesh K. and Harinder K. and the murder of Raveesh." (*Garcia*, *supra*, 46 Cal.App.5th at p. 130.)

"Specifically, count 1 alleged that, on or about November 30, 2012, Garcia and Austin killed Raveesh with malice aforethought ([] § 187) while engaged in the commission of a robbery (§ 190.2, subd. (a)(17)). Count 2 alleged robbery of an inhabited place while acting in concert (§§ 211, 213, subd. (a)(1)(A)). Count 3 alleged an assault on Harinder with a deadly weapon (§ 245, subd. (a)(1)). Count 4 alleged criminal threats on Harinder (§ 422). Counts 5 and 6 alleged false imprisonment of Raveesh and Harinder, respectively (§§ 236, 237). All counts included gang allegations for Garcia and Austin (§ 186.22, subd. (b)(1)(A)). In addition, the information alleged that Garcia had a prior felony conviction under Health and Safety Code section 11351 ([] § 667.5, [former] subd. (b))." (*Garcia*, *supra*, 46 Cal.App.5th at p. 130, fn. omitted.)

### B. Trial Evidence

#### 1. Prosecution Evidence

Katrina Fritz is Austin's older sister.[4] Fritz worked as a prostitute, including for Raveesh, whom she met around 1999 when she was 19 years old. Between 1999 and 2011, Fritz visited Raveesh over 100 times at his home in Monte Sereno, which he shared with his ex-wife Harinder. Raveesh compensated Fritz well for sex and companionship. Fritz had brought Austin to Harinder and Raveesh's house about two or three times between approximately 2003 and 2008. Fritz was familiar with the layout of the house and knew that Harinder and Raveesh typically left the doors unlocked. Fritz last saw Raveesh about one year before the robbery.

---

[4] The district attorney initially charged Fritz with murder, robbery, and other offenses for her involvement in the crime against Harinder and Raveesh. Pursuant to a plea agreement (under which the district attorney dismissed the murder charge), Fritz testified against Garcia and Austin. She also testified at the trial of another perpetrator, Marcellous Drummer.

Shortly after Thanksgiving in 2012, Austin called Fritz and asked her if she was still involved with Raveesh and whether he had money and jewelry at the house. Austin said that he was thinking of going there, which Fritz understood to mean Austin was contemplating committing a robbery. Fritz told Austin not to commit the robbery, but Austin said something "like, [c]ome on, it's okay." Fritz also offered to call or visit Raveesh to get him out of the house, but Austin told her not to do so because Raveesh would suspect she was involved, given the lack of recent contact.

Later in November 2012, Austin called Fritz from Monte Sereno and asked for directions to Harinder's and Raveesh's house. When Austin arrived at the house, he told Fritz that he saw a lot of cars. The house was large, with two floors and a self-contained apartment on a lower, third floor. Cell phone records confirmed that Austin's phone was in the vicinity of Harinder and Raveesh's house in the early afternoon of November 29, 2012.[5]

Later that day, Austin called Fritz again and asked for a drawing of the home's layout. Fritz and Austin arranged to meet in north Oakland. They met in the midafternoon, and Fritz gave Austin a map of the residence. Marcellous Drummer was with Austin, and Fritz saw a Black man inside the car (Fritz's BMW X5) that Austin had driven to the meeting. Fritz explained the map to Austin and Drummer, who were both excited, and they discussed gold and money. When Fritz asked Austin who was going with him to commit the crime, Austin said "his partner from West Oakland." Austin described the partner as being "[t]his n[-word] from Ghost Town." Fritz was surprised by this statement because she did not know that Austin had any friends from Ghost Town (which she knew to be both a neighborhood in West Oakland and a gang). Fritz told Austin and Drummer to be careful. Drummer responded, "I got this," and Austin said, "Sis, you know I know what I'm doing."

---

[5] Unless otherwise indicated, all dates were in 2012.

After leaving Austin and Drummer, Fritz drove to a hotel in San Francisco to meet with a customer. Fritz planned to borrow a hotel room rented by Summer Sawyer, who was dating Austin at the time. As Fritz was entering an elevator at the hotel she saw Austin, Drummer, and a third man step out. Fritz did not get a good look at their faces, but she observed that the third man was a Black male who was shorter than Austin. Fritz did not speak with them, and she could not say whether the third man was Garcia.

Later that day, after 10:00 p.m., Austin called Fritz and told her he was "on his way out there" to Harinder's and Raveesh's house. Austin called again later and said he was at the house and was watching Raveesh, who had been drinking alcohol. Austin said he was about to enter the house. Fritz told Austin not to do too much, to be careful, and to stop calling her phone. Cell phone records showed that, at approximately 12:03 a.m. on November 30, Austin made a one-minute-and-seven-seconds call to Fritz from the vicinity of Harinder's and Raveesh's house.

On November 29, Harinder went to bed around 10:00 p.m. After Harinder had fallen asleep, she awoke to a knock on her bedroom door and someone entering the room. The intruder was Austin. Austin got onto the bed with an illuminated cell phone in his hand. Harinder screamed for Raveesh, and Austin hit her in the face with something hard, cutting her lip. Austin directed Harinder to stop screaming and told her to march down to the kitchen if she wanted Raveesh. Harinder testified that no one had threatened her during the incident.[6] Austin gave her a piece of laundry to wipe the blood from her face.[7]

---

[6] A police detective, however, testified that Harinder had told him the person on her bed said that he was going to shoot her. Harinder also had told the detective that, at another time, the intruders said they would "kill her" and told her to keep quiet if she wanted to live.

[7] After the crime, Harinder received stitches for the wound Austin inflicted on her lip. A plastic surgeon did the stitching due to the extent of the injury and the amount it had bled before Harinder was taken to the hospital.

Harinder walked to the kitchen with Austin following her. In the kitchen, Harinder saw Raveesh's back and the shadow of a hand on his shirt trying to push him down. Raveesh's hands were tied, and he was struggling to free himself. He was standing, and Harinder saw his desperation and heard him say, "Please help me." Harinder had also told the police shortly after the crime that she saw people beating Raveesh. Moreover, a police detective testified that one week after the crime, Harinder told him that she had seen the man who entered her bedroom and "two additional people" who also were male.

When the men were putting Raveesh down to the floor, Harinder told them not to tie him up. She told them that Raveesh was a heart patient and would die. The men did not respond to her. She eventually saw Raveesh—who was a large man—go down to the floor, facedown.

Someone wrapped tape over Harinder's eyes and mouth and tied her hands. They asked her to get down on the floor and then bound her legs with a blanket. Harinder had told the police that when she twice moved her hands, someone hit her, once on her leg and once on her hands. At one point, someone tried to remove gold bangles from her wrist; it hurt, so Harinder took the bangles off herself and handed them over. Two men asked her where the safe and money were, and Harinder told them the money, jewelry, and other valuables were in the master bedroom. After about an hour or two, Harinder told a man who was sitting in a chair beside her that Raveesh had not moved. The man got up, said he would look at Raveesh, and then came back and told her not to worry and that they would call 911 if needed. Based on the voices she heard, Harinder was not sure whether the man who stayed beside her was the same person who struck her face. She heard the voices of two or three different people roaming around the house.

Sometime later, a man told Harinder that they would be leaving soon and that she should not move. Eventually Harinder freed her legs, got up, and looked for a phone. She found one and called 911. All other phones in the house had been disconnected by

6

the perpetrators. Harinder asked for help and said that she believed Raveesh was dead. Harinder had told the police that she shook Raveesh before and after she called 911.[8]

The police arrived at Harinder and Raveesh's house around 1:42 a.m. on November 30. They found Raveesh lying face down, cold to the touch, and unresponsive in the family room adjacent to the kitchen. His hands and legs were bound together, hog-tied. Raveesh's face was masked with a distinctive mustache-patterned duct tape. A police officer testified that the "tape had been wrapped around [Raveesh's] head several times covering his mouth and almost up to his nasal passage." The officer "tried to remove the tape from around his mouth" in an effort to "clear the airway," and he rolled Raveesh over on his back. Harinder asked the police to show her Raveesh, and she saw that "they had already turned him over" and there "was so much mask on him that even his nose, everything was masked. His whole face was masked." An empty cardboard tape roll and a pair of tan pants with a piece of the duct tape on them that matched the duct tape on Raveesh's face were found in the family room.

The interior of the large house had been ransacked, but there were no signs of forced entry. Jewelry, money, coins, and cameras were missing. A number of latex gloves were found in the kitchen sink.[9] Other latex gloves were found in the kitchen cabinets and drawers. Police also discovered another latex glove and an empty latex glove box on an embankment alongside a road adjacent to the house's fence.

The morning after the crime, Fritz heard a television news report about a home invasion homicide in Monte Sereno. This news scared Fritz, and she called Sawyer in an effort to reach Austin. Austin was sleeping, but he called Fritz back later. The two arranged to meet for brunch at a restaurant in Berkeley. Austin arrived at the restaurant

---

[8] Harinder testified at trial that she "never touched" Raveesh before the police arrived.

[9] Harinder testified that the latex gloves in the sink did not belong to her.

with Drummer and Sawyer. Fritz asked Drummer what had happened, and he said, "Shit went bad." While they were sitting at a table, Austin gave Fritz $2,000.

After their meal, in the restaurant's parking lot Fritz asked Drummer and Austin what happened. Austin said that "shit went crazy" and that "somebody" was hitting Raveesh and Raveesh tried to fight back. Austin said that Harinder was "screaming, saying that, whatever [Raveesh] owes, I'll pay it." Drummer said that he had not done anything and had just sat there "watching them." Austin acknowledged knowing Raveesh was dead.

When Fritz asked if Austin and Drummer had left anything at the house that could tie them to the crime, Austin responded that they had gotten rid of everything, including gloves, clothes, and a crowbar. Austin told Fritz that if anything happened, they would confess, and Fritz would not have to go to jail. Fritz asked what they had done with the stolen goods, and Austin said that they had pawned them at a pawnshop in San Francisco. Austin denied using Fritz's BMW to commit the crime and said he had taken "the other dude's car."

On a later date, Austin gave Fritz $40,000 to hide for him. At some point after giving Fritz this money, Austin called Fritz and asked her to check whether the name "Javier Garcia" was listed on Santa Clara County's online inmate locator. This was the first time Fritz had heard Garcia's name. Fritz told Austin that the inmate locator indicated Garcia was in custody for murder. Fritz asked Austin, "Does this have anything to do with that thing?" and Austin said, "Yes."

Forensic pathologist Michelle Jorden performed an autopsy on Raveesh's body. Dr. Jorden concluded that the manner of Raveesh's death was homicide and that the cause of his death was probable asphyxia due to suffocation by the duct tape over his mouth. Dr. Jorden also found several contributory conditions to the cause of death, including sleep apnea, deviated nasal septum, coronary atherosclerosis, and hypertensive cardiovascular disease. Dr. Jorden observed duct tape wrapped around Raveesh's head

8

three times "at the level of the eyes, including portions of the eyes." When Dr. Jorden observed Raveesh's body, there was no tape at or near Raveesh's nose or mouth. There was a dangling portion of duct tape along one side of his body. Dr. Jorden swabbed the duct tape that was wrapped around Raveesh's head to preserve any trace evidence.

Dr. Jorden observed fabric binding Raveesh's ankles and wrists. Dr. Jorden explained that Raveesh had an enlarged, "very, very bad heart." Because enlarged hearts require more oxygen, the tape over Raveesh's mouth, his obstructed nasal passages, and the physiological stress and terror of the crime would have placed additional stress on Raveesh's diseased heart. Dr. Jorden observed petechial hemorrhages in Raveesh's eyelids, which are indicative of asphyxia or heart attack, and petechial hemorrhages in his distal trachea and bronchi, suggesting suffocation. Dr. Jorden also determined that Raveesh had been struck at least three times on his head based on three blunt-force-trauma injuries to his scalp and skull. One of the head injuries was a patterned bruise to Raveesh's right temple, suggesting he had been struck by an object. In addition, Raveesh had several lacerations and abrasions on his face; a bruise on his inner left arm; an abrasion on his abdomen; and a hemorrhage in his neck muscle.

During the investigation of the crime, Santa Clara County criminalist Tahnee Mehmet received 67 items of evidence for analysis. The police department requested DNA analysis of 20 evidence items (including the multiple latex gloves as one item); 13 of the 20 items were analyzed for DNA. Mehmet determined that Garcia was a possible contributor to the major component of the DNA mixtures found on four of the 21 gloves collected from Harinder and Raveesh's kitchen sink. Specifically, Mehmet concluded that Garcia was a possible contributor to the DNA mixtures detected on the exterior of the 4th, 9th, 17th, and 21st gloves recovered from the sink.[10] Mehmet also found a DNA

_____

[10] As to the fourth glove, the mixture contained DNA from at least three individuals, including Raveesh. Regarding the three other gloves, Mehmet's analysis

mixture of at least two individuals on the exterior of a glove found in a kitchen cabinet and determined that Garcia was a possible contributor to that mixture.

Mehmet detected a DNA mixture of at least two individuals on the piece of tape found on the tan pants recovered from the family room. Mehmet determined that Austin was the source of the major DNA profile found on the tape, and that Raveesh was a possible contributor to the minor DNA profile. Mehmet concluded that Austin was also the source of the major DNA profile in a mixture swabbed from the edge of a duct tape roll, which Mehmet described as "an empty cardboard tape roll with a small piece of tape still adhering." Raveesh and Harinder were possible contributors to this mixture as well. In addition, Austin and Raveesh were possible contributors to the major DNA component of a mixture that included at least three people swabbed from the inner area of the tape roll. Reddish brown stains on the tape roll tested presumptively but not conclusively for blood.

Mehmet did not provide specific testimony of any DNA analysis she conducted on the tape recovered from Raveesh's body, including the tape found on his head. Mehmet tested areas of the duct tape she thought it was likely someone had touched.

Mehmet determined that Drummer was a possible contributor to the DNA mixture of at least four individuals found in swabs taken from Raveesh's right hand. Raveesh and Harinder contributed to this mixture as well. In addition, Mehmet developed a DNA profile for Garcia's cousin, Eddiebo Rodriguez. Mehmet did not detect Rodriguez's DNA on any of the analyzed evidence items.

Mehmet said that other than those items about which she specifically testified, she did not find any DNA evidence on the items that she analyzed that matched the known

revealed that the mixtures on the ninth and 17th gloves contained DNA from at least three individuals, and the mixture on the 21st glove contained DNA from at least four individuals.

10

profiles of the approximately 20 people for which she tested, other than DNA associated with the victims.

Garcia was arrested for this crime in Oakland on December 27. At the time, Garcia was in the company of Rodriguez and another person. Garcia told the police that he had never been to Monte Sereno or the Los Gatos area and had never seen Harinder or Raveesh. During his police interview, Garcia said that he did not know the case was "so serious" and that the officers had "said people were dying," but the officers had not previously mentioned that anyone had died.

Austin was arrested by Sacramento police on December 29.

Cell phone records revealed that, from November 25 through December 7, there were a total of 84 calls and nine texts between Austin's phone and Garcia's phone. There were also a total of 74 contacts between Austin's phone and another phone associated with Garcia from November 25 through December 8. Between December 8 and December 27, Garcia's phone was in contact 23 times with a phone associated with Austin.

More specifically, from around the time of the crime, the phone records revealed: Between 5:13 a.m. on November 29 to 8:05 p.m. on November 30, there were 10 calls between Austin's phone and Garcia's phone, 20 calls between Austin's phone and Fritz's phone, and 12 calls between Austin's phone and the phone of Garcia's cousin, Sitteruiet T. Between 8:05 p.m. on November 30 and 4:14 p.m. on December 1, there were nine calls between Austin's phone and Garcia's phone, six calls between Austin's phone and Sitteruiet T.'s phone, and none between Austin's phone and Fritz's phone.

Cellular phone expert Jim Cook reviewed the cell phone information that had been collected and determined that Austin's phone and Garcia's phone were in the vicinity of Oakland until after 9:00 p.m. on November 29. Garcia's and Austin's phones then traveled south toward the crime scene. Garcia's phone and Austin's phone were in the vicinity of Harinder's and Raveesh's house around and after midnight on November 30.

11

Garcia's phone called Austin's phone at 12:44 a.m. on November 30, and both phones connected to cell towers Cook would have expected them to, had the phones been at Harinder's and Raveesh's house.[11] The next activity on Garcia's phone was at 5:34 a.m., when it was in the area of the Francisco Bay Inn in San Francisco. Austin's phone also was in the vicinity of the Francisco Bay Inn from 2:32 a.m. to 8:39 a.m. on November 30.

Oakland Police Officer Roberto Garcia testified as a gang expert and opined that defendant Garcia was a member of the Ghost Town gang at the time of the charged crime.[12]

### 2. Defense Evidence

Garcia testified in his own defense.[13] He was raised in Oakland and had lived in several neighborhoods, including Ghost Town. Garcia's grandmother raised him, and he calls her his "mother" because his actual mother "was on crack." His family members included his grandmother, brothers, cousins, the mother of his child, and their young daughter. Garcia went to school until 11th grade, but he never graduated from high school or obtained a GED. Nonetheless, he obtained a few trade certificates. Garcia admitted he earned money by selling drugs.

---

[11] Drummer's cell phone and Sitteruiet T.'s cell phone were also in the vicinity of the crime scene at the time of the incident. However, Sitteruiet T.'s DNA was not found on the analyzed evidence.

[12] Another Oakland Police Officer, Daniel Bruce, testified as a gang expert at Garcia's trial. Bruce opined that Garcia was a member of the ENT gang and his cousin Rodriguez was a member of both the Ghost Town gang and the ENT gang. Bruce explained that Ghost Town is aligned with ENT and it is possible to be a member of two gangs. Bruce also opined that Austin and Drummer were members of the ENT gang at the time of the charged crime.

At the evidentiary hearing on Garcia's section 1172.6 petition, the trial court admitted Bruce's trial testimony "solely to impeach Mr. Garcia's testimony."

[13] Garcia was 25 years old at the time of his trial. At the evidentiary hearing on Garcia's petition, the parties stipulated that Garcia was born on February 26, 1991. Thus, Garcia was 21 years and nine months old at the time of the November 2012 offense.

Garcia denied any gang affiliation, or that "Ghost Town" is a gang. Garcia admitted that he had gone to prison in 2010 for selling drugs and that he was supervised by a probation officer until the end of October 2012.[14]

Garcia testified that his cousin Rodriguez had introduced him to Austin about three months before the charged crime and that they had friends in common. Garcia talked with Austin two or three times a week and used drugs and played video games with him. Garcia did not know Fritz or Drummer prior to their prosecution for this crime. Garcia denied committing any residential burglaries with Rodriguez, Austin, or any of Austin's friends. Garcia said he had never been to Monte Sereno or Los Gatos, and he denied committing the charged crime.

In November 2012, Garcia was selling and using drugs and living at the house of Marquez Slaton, whom he knew as Gwiizy. Garcia used latex gloves to package the drugs he sold because he did not want to test positive for drugs. Garcia would throw the gloves away if they ripped, but he would sometimes return used gloves to the box, so he could reuse them.

On November 29, Garcia was at Gwiizy's house when Rodriguez arrived around 8:00 or 9:00 p.m. "talking about wanting to use some stuff." Rodriguez stayed at Gwiizy's house for approximately 10 to 15 minutes before leaving with a "bipper" (a type of hole puncher), Garcia's cell phone, and an open box of latex gloves that was similar to the box found by police outside of Harinder's and Raveesh's residence. Rodriguez had borrowed the bipper before, and it was not unusual for him to borrow or take Garcia's phone. Rodriguez said that his own phone "was messing up that day," but

_____

[14] On cross-examination, Garcia said he had pleaded guilty to the drug offense, but he denied committing it, explaining that he took the blame for someone else.

13

he did not say whether his phone was working or not.[15] Rodriguez did not tell Garcia how long he wanted to keep Garcia's phone.

Garcia next saw Rodriguez the following day. Rodriguez gave Garcia his phone back but did not tell Garcia what he had done the previous night. Garcia first learned of the crime when he overheard Rodriguez talking about it around a week or so before Garcia's arrest on December 27. Garcia testified that Rodriguez died on January 11, 2013. Prior to Rodriguez's death, Garcia sought to have Rodriguez speak with Garcia's defense counsel about the case and Garcia's cell phone.

Austin also testified in his own defense. Austin admitted that he was one of the people who robbed Harinder and Raveesh. He said he wanted to get money for his family and that he came up with the idea to rob them. But Austin denied that he wanted anyone to die. He acknowledged that Fritz had told him Raveesh was old and had asked him to be careful and not to hurt Raveesh. However, Fritz had not mentioned anything about Raveesh's medical conditions. Austin gave Fritz his "word" that he was not going to hurt anyone. He did not think Raveesh would resist; he thought the robbery would be an "easy situation." Austin claimed that he "specifically told people that it was no need [*sic*] for no gun or no knife." He was unaware whether any of his coperpetrators had killed people before. He also did not know for sure if the others were armed, but he saw no weapons before, during, or after the robbery.

Austin refused to identify the individuals who had participated in the robbery with him, and he claimed not to recall who was there. But he acknowledged there were multiple males involved in the crime and said it was "[m]ore than three" and "[m]aybe" more than five. Austin said they wore gloves.

Austin admitted to watching Raveesh "swigging at the alcohol" from a position outside the house. Austin denied that he supplied the duct tape used on Harinder and

---

[15] Cell phone records indicated that, on November 29, Garcia's phone called Rodriguez's phone at 9:32 p.m. (for 41 seconds) and 9:38 p.m. (for 112 seconds).

Raveesh. He admitted, however, that he grabbed the duct tape from the car, "because it was forgotten," and then handed it over to a coperpetrator knowing it would be used to bind and gag Raveesh. When asked if he put on gloves before or after he retrieved the duct tape, Austin said, "This was before I got the duct tape. No. After. I mean after." Austin went to the home's master bedroom upon entry and was surprised to find Harinder there. Austin admitted that he hit Harinder (but only with his fist) and wanted her to stop screaming, but he denied threatening to kill Harinder.

Austin said that when he brought Harinder to the family room, he told the others to be careful with her. He also saw individuals restraining, beating, and trying to tape Raveesh, who was yelling and fighting and "struggling back." Austin testified, "It could have been one person holding [Raveesh] and one person taping him and then in the mess of me walking up with [Harinder], one of the people came and grabbed her and I told the individual to be careful with her." Austin denied hearing Harinder say anything about Raveesh having a medical condition, weak heart, or difficulty breathing. In addition, Austin denied applying duct tape or any restraints on Raveesh or Harinder, and he said he did not direct or suggest how they should be restrained (but he knew the others might use the tape to tie up Raveesh and cover his mouth). Austin left the family room and went back to the master bedroom where he thought he would find a safe. He claimed he only ransacked the master bedroom area of the house.

Austin returned to the family room area near the end of the incident. He saw that Raveesh was dead and that Harinder was moving around, crying, and in bad shape. Austin said he was at the house for 40 minutes. He left the house and returned to his hotel room at the Francisco Bay Inn after midnight. He acknowledged meeting with Fritz at the restaurant later that day, and he corroborated much of Fritz's testimony, including confirming his many statements to her, giving her money, pawning the stolen goods, and asking her to search the online inmate locater for Garcia's name. Austin testified that he

15

had pawned the stolen items for about $60,000 and he "ended up with [$]20,000." Austin also said that he had "never hung out with" Garcia and Drummer at the same time.

In addition to testifying about his participation in the charged crime, Austin testified about his involvement with the ENT gang, which he formed when he was 20 years old as a memorial to friends who had died. When Austin created ENT, he did not consider it to be a gang. Austin denied committing any crimes at the direction of someone associated with ENT or directing others to commit crimes for his benefit as a founder of ENT. Austin said he committed crimes for his own benefit and that of his family.

Austin admitted that he had been convicted of residential burglary in 2011 and sentenced to state prison. He also acknowledged having been convicted of being a felon in possession of a firearm in 2012. He was released from prison in August 2012. He testified that he had participated in other residential burglaries in the past.

### C. Verdict and Sentencing

"On June 7, 2016, the jury found Garcia guilty of first degree murder, robbery, misdemeanor battery (§ 242) as a lesser included offense of assault with a deadly weapon, making criminal threats, and both counts of false imprisonment. The jury deadlocked on the robbery-murder special circumstance allegation under section 190.2, subdivision (a)(17), and found not true the gang allegation attendant to the murder charge. The jury also found not true the gang allegation regarding the battery conviction and deadlocked on the gang allegations regarding the remaining counts. The trial court separately found Garcia's prior felony conviction allegation true." (*Garcia*, *supra*, 46 Cal.App.5th at pp. 130–131, fns. omitted.) "The [trial] record does not indicate that the trial court took any further action with respect to the allegations on which the jury deadlocked." (*Id*. at p. 131, fn. 5.)

"The trial court sentenced Garcia to 25 years to life for his first degree murder conviction on count 1, which was imposed consecutive to nine years for the robbery

16

conviction on count 2, eight months consecutively for each conviction for criminal threats and false imprisonment on counts 4, 5, and 6, and one year for the prior felony conviction enhancement, for a total term of 37 years to life in prison." (*Garcia*, *supra*, 46 Cal.App.5th at p. 131.)

### D.  Direct Appeal and Remand

In his direct appeal, Garcia raised 14 claims of error.  (See *Garcia*, *supra*, 46 Cal.App.5th at p. 142.)  This court found "no reversible error for Garcia's conviction. Nevertheless, we vacate[d] Garcia's sentence because the one-year prior prison term enhancement imposed on him [had to] be stricken under currently applicable law.  Hence, we remand[ed] Garcia's case for resentencing.  We also remand[ed] his case pursuant to *People v. Franklin* (2016) 63 Cal.4th 261 . . ., for a determination by the trial court whether Garcia was afforded sufficient opportunity to make a record for his eventual youth offender parole hearing." (*Id*. at p. 129.)

On remand, the trial court struck the one-year prior prison term enhancement and resentenced Garcia to 25 years to life consecutive to 11 years, for a total sentence of 36 years to life in prison.

### E.  Petition for Resentencing

In September 2021, through counsel, Garcia filed his petition to vacate the murder conviction and be resentenced.  He asserted that the record of conviction demonstrated he was not the actual killer, did not aid and abet with the intent to kill, and was not a major participant who acted with reckless indifference to human life.  Garcia also asserted that the district attorney is precluded from arguing against resentencing because the district attorney had the opportunity to retry the robbery-murder special circumstance allegation and chose not to do so.

The district attorney filed an opposition to the petition.

The trial court issued an order to show cause under section 1172.6, subdivision (c).

Neither party offered any new evidence at the evidentiary hearing held pursuant to section 1172.6, subdivision (d). The trial court admitted and considered the reporter's transcripts and exhibits from the Garcia/Austin trial (excluding, pursuant to a ruling on Garcia's in limine motions, certain portions of those transcripts and exhibits). The parties submitted written and oral arguments on the evidence and issues presented. Regarding Garcia's potential liability under current murder law, consistent with his argument to the jury at trial, the district attorney asserted only that Garcia was a major participant in the robbery who acted with reckless indifference to human life.

In a lengthy written order, dated February 6, 2023, the trial court denied Garcia's petition. The court described the crime thusly: "This was a home invasion robbery on or about November 30, 2012, by three people ([Garcia], Marcellus Drummer, and DeAngelo Austin) where Raveesh [] died from asphyxiation after being beaten and tied with duct tape. His ex-wife Harinder [] was beaten in the face by Austin, brought downstairs bleeding from her lip where she was blindfolded and tied-up near Raveesh. She warned the robbers that Raveesh was a heart patient and would die." (Fns. omitted.)

Examining the evidence under *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), *People v. Clark* (2016) 63 Cal.4th 522, and *In re Scoggins* (2020) 9 Cal.5th 667 (*Scoggins*), the trial court found that the district attorney had proved beyond a reasonable doubt that Garcia "was a major participant and acted with reckless indifference to human life." The court further concluded that neither claim preclusion nor issue preclusion prevented the district attorney from proving in this proceeding that Garcia was a major participant in the robbery who acted with reckless indifference to human life because there was "no proof that the People (or the [c]ourt) dismissed the special circumstance due to insufficient evidence."

## II. DISCUSSION

Garcia challenges the sufficiency of the evidence supporting the trial court's findings that he was a major participant in the robbery who acted with reckless

18

indifference to human life.  He further contends that the jury's inability to reach a unanimous decision on the robbery-murder special circumstance allegation and the district attorney's failure to pursue a retrial constituted a de facto dismissal that collaterally estops the district attorney from contesting the petition.

## A.  Sufficiency of the Evidence Claim

### 1.  Legal Principles

Senate Bill No. 1437 (2017–2018 Reg. Sess.) "significantly limited the scope of the felony-murder rule to effectuate the Legislature's declared intent 'to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' "  (*People v. Strong* (2022) 13 Cal.5th 698, 707–708 (*Strong*).)  "Senate Bill [No.] 1437 also created a special procedural mechanism for those convicted under the former law to seek retroactive relief under the law as amended."  (*Id.* at p. 708.)

A person remains liable for felony murder under the law as "amended by the changes to [s]ection 188 or 189 made effective January 1, 2019" (§ 1172.6, subd. (d)(3)) if the person "was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [s]ection 190.2" (§ 189, subd. (e)(3)—"that is, the statute defining the felony-murder special circumstance." (*Strong*, *supra*, 13 Cal.5th at p. 708.)

In *Banks* and *Clark*, the California Supreme Court "provided substantial guidance on the meaning of" major participation and reckless indifference to human life under section 190.2, subdivision (d).  (*Strong*, *supra*, 13 Cal.5th at p. 703.)  "*Banks* identified a series of considerations to help guide the inquiry" (*id*. at p. 705), focusing "primarily on the major participant element" (*id*. at p. 706).  The factors *Banks* identified are:  "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What

19

awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. omitted.) The *Banks* court added, "No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' " (*Ibid*.)

In *Clark*, our Supreme Court "reiterated the *Banks* standard governing major participation" and further "concluded that ' "reckless indifference," . . . encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his [or her] actions.' " (*Strong*, *supra*, 13 Cal.5th at p. 706.) In *Clark*, "[m]uch as in *Banks*, [the court] set out a nonexhaustive list of considerations relevant to this determination, including use of or awareness of the presence of a weapon or weapons, physical presence at the scene and opportunity to restrain confederates or aid victims, the duration of the crime, knowledge of any threat the confederates might represent, and efforts taken to minimize risks." (*Ibid*.) "Because the major participant and reckless indifference elements often " 'significantly overlap' " [citation], this list of factors also overlapped with those [the court] had identified in connection with the major participation inquiry in *Banks*." (*Ibid*.)

"Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, ' "[t]he risk [of death] must be of such a nature

20

and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' [Citation.] 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement. [Citation.] Notably, 'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life." (*Scoggins*, *supra*, 9 Cal.5th at p. 677.) The analysis of reckless indifference to human life involves "the totality of the circumstances." (*Ibid.*)

"At an evidentiary hearing under section 1172.6, subdivision (d)(3), the trial judge is charged with determining, beyond a reasonable doubt, if the petitioner is guilty of murder under a theory that remains valid after the amendments to the substantive definition of murder." (*People v. Vargas* (2022) 84 Cal.App.5th 943, 952 (*Vargas*).)

### 2. Standard of Review

"Ordinarily, a trial court's denial of a section 1172.6 petition is reviewed for substantial evidence." (*People v. Reyes* (2023) 14 Cal.5th 981, 988.) Relying principally on *People v. Vivar* (2021) 11 Cal.5th 510, Garcia contends that we should afford no deference to the trial court's findings and independently review the evidentiary hearing evidence because the trial court denied the petition "based solely on the cold record consisting of trial transcripts and exhibits." Several Courts of Appeal have considered and rejected this argument, as do we. (See, e.g., *People v. Underwood* (2024) 99 Cal.App.5th 303, 313–314; *People v. Njoku* (2023) 95 Cal.App.5th 27, 43; *People v. Werntz* (2023) 90 Cal.App.5th 1093, 1110, review granted Aug. 9, 2023, S280278; *People v. Oliver* (2023) 90 Cal.App.5th 466, 480; *People v. Sifuentes* (2022) 83 Cal.App.5th 217, 232–233; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 591; *Clements*, *supra*, 75 Cal.App.5th at p. 301.) As other courts have explained, the central

prejudice issue in *Vivar* "was a legal question traditionally afforded independent judgment review," whereas "the issue here is a factual one traditionally afforded substantial evidence review." (*Njoku*, at p. 43.) Whether a defendant aided and abetted his confederate with reckless indifference to human life is predominantly a question of fact. We thus review the trial court's factual findings for substantial evidence. (*Underwood*, at p. 314.)

"While the superior court acts as an independent fact finder in determining whether the People have met their burden, on appeal, the reviewing court applies the substantial evidence standard to the superior court's findings. [Citation.] Under this familiar standard, ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.] In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' [Citations.] Substantial evidence also ' "includes circumstantial evidence and any reasonable inferences drawn from that evidence." ' " (*Vargas*, *supra*, 84 Cal.App.5th at p. 951; see also *People v. Mumin* (2023) 15 Cal.5th 176, 199 ["[A]n appellate court retrospectively inquires whether a rational trier of fact *could have* found the defendant guilty beyond a reasonable doubt, based on all the evidence when viewed in the light most favorable to the prosecution."].) "However, '[a] reasonable inference . . . "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." ' " (*People v. Davis* (2013) 57 Cal.4th 353, 360.)

22

### 3. Analysis

The trial court considered the *Banks*/*Clark* factors in deciding that the evidence proved Garcia was a major participant in the underlying robbery and acted with reckless indifference to human life. Regarding the major participant element, the court found "no direct evidence of Garcia's role in planning this home invasion robbery." However, the court cited several facts regarding planning that implicated Garcia and culminated in the perpetrators entering a house they knew was occupied. These facts included that Austin and Drummer planned the crime by obtaining a map from Fritz (while accompanied by an unidentified Black man) and Austin said he was going to commit the crime with a partner from West Oakland and Ghost Town—a neighborhood/gang to which Garcia was connected. The court also noted that Garcia's cell phone travelled to the area of the crime around the same time as Austin's phone, Garcia's phone called Austin's phone and was in the vicinity of the victims' house with the phones of Austin and Drummer, the perpetrators lurked outside the house and watched Raveesh drinking alcohol (and thus knew they would have to confront him upon entry), and the perpetrators "showed no hesitation in using force" when they encountered resistance upon entry. Based on the trial evidence detailed *ante* (see pt. I.B.), we conclude substantial evidence supports the trial court's findings regarding planning activity that inferentially implicates Garcia.

The trial court acknowledged there is "no evidence Garcia supplied or used lethal weapons" or the duct tape. Nonetheless, the court concluded "Garcia played a role in holding Raveesh or at least was present when Raveesh was being put down on the floor, beaten and taped, despite Harinder's caution about his medical condition." Contrary to Garcia's argument on appeal, substantial evidence supports this finding. Although Harinder did not testify to the exact number of men who were attacking Raveesh in the kitchen area when Austin brought her there, her testimony and that of the police investigators supports a reasonable inference that two men (in addition to Austin) were present and could hear her say they should not bind Raveesh, he was a heart patient, and

23

would die. As discussed *ante* (see pt. I.B.1.), Harinder reported to police that she saw people beating Raveesh and there were "two additional" male robbers (plus Austin). Furthermore, the DNA mixture found on the fourth glove included Raveesh's and Garcia's DNA, suggesting that Garcia touched Raveesh during the crime.

We are not persuaded by Garcia's argument that Harinder's testimony shows that she uttered her warning about Raveesh's medical condition "to the person who later was sitting in the chair next to her" and "did not say that she made the statement to all three men." Harinder testified on direct examination, "I had - - actually, *when they were putting [Raveesh] down*, I had told this person [who sat next to her in a chair], I said he is a heart patient. Don't do that to him. He'll die. And they didn't listen." (Italics added.) Harinder also said "they" did not respond to her warning. On cross-examination, Harinder explained further that when she entered the kitchen, she observed Raveesh for "[v]ery few seconds []. *And then I did tell them* not to tie him because he's a heart patient" and "[h]e would die." (Italics added.) She added, "I think by that time, they started tying me. Somebody was tying my eyes, masking my eyes and stuff like that." Harinder's testimony supports a finding that she warned all the perpetrators about Raveesh before she was blindfolded, bound, placed on the floor, and watched over by the man sitting in the chair beside her.

Austin's trial testimony likewise bolsters the inference that there were two other perpetrators present in the kitchen area when Harinder warned them about Raveesh's vulnerability. Austin testified about two people attacking Raveesh and said one of them then "came and grabbed" Harinder. In addition, Austin's testimony about personally netting $20,000 (i.e., a one-third share) of the crime's proceeds suggests the involvement of three perpetrators. Considering the totality of the evidence, substantial evidence supports the trial court's finding that there were three perpetrators in the house and all of them (including Garcia) were nearby when Harinder uttered her warning to them soon

24

after she entered the kitchen and before they taped over her eyes and mouth and placed her on the floor.

The trial court acknowledged that there is "no evidence Garcia knew of the particular dangers" of this unarmed, home invasion robbery before it occurred or "anything about the other participants['] propensity toward violence before the attack." Nevertheless, the court found that Garcia "was present throughout the very lengthy robbery and had the opportunity to restrain his co-participants." The court explained further: "Since one co-participant was sitting with the victims, and two people asked Harinder where the money and the safe was, all three participants could see the situation. Garcia's DNA was found on gloves in the kitchen. Under the totality of the circumstances, Garcia was subjectively aware that the actions of himself and his co-participants objectively posed a grave risk of death to Raveesh."

Substantial evidence supports the trial court's finding. The DNA and cell phone evidence placed Garcia at the crime scene. Further, the DNA mixture found on the fourth glove (which included Raveesh's and Garcia's DNA) and other evidence indicates that Garcia was involved in the attack on Raveesh, ransacked the house for a lengthy period while Raveesh and Harinder lay restrained, and did nothing to assist them.

In sum, given all the evidence implicating Garcia, we conclude that substantial evidence supports the trial court's findings and conclusion that Garcia was a major participant in the underlying robbery.

Regarding the reckless indifference element, the trial court acknowledged that Garcia did not use or know that a lethal weapon would be used during the robbery. Further, the court observed that no lethal weapon was in fact used by the perpetrators, there is "no evidence that Garcia had any prior knowledge of his confederates' propensity for violence or likelihood of using lethal force," and "[t]here is no evidence that Garcia used or supplied the duct tape. But he knew that both Raveesh and Harinder were beaten and tied with duct tape and fabric."

25

Notwithstanding the lack of evidence regarding a weapon and propensity for violence, the trial court reiterated that Garcia was present in the home "for at least 40 minutes, or longer," "was in the kitchen/family room area of the house, the site of the murder, for a time after Harinder was brought there," and "played a role in holding Raveesh or at least was present when Raveesh was being put down on the floor, beaten and taped, despite Harinder's caution about his medical condition." The court noted further that "there is no evidence that [Garcia] made any effort to restrain the crime or aid the victims" and "the robbers [had] disconnected phones in the house to prevent the residents from calling for help." The court concluded that the evidence "supports a finding that Garcia was subjectively aware that the actions of himself and his co-participants objectively posed a grave risk of death to Raveesh."

There is substantial evidence confirming the trial court's examination of the *Clark* factors and its conclusion that Garcia acted with reckless indifference to human life. The evidence proved that Garcia was in the house when Raveesh was bound, taped, and beaten upon entry and Garcia remained inside for an extended period. Harinder testified that she told the men when they were "putting [Raveesh] down" that Raveesh "is a heart patient. Don't do that to him. He'll die." Nevertheless, Garcia took no action to aid Raveesh, to prevent his death, or to dissuade his coperpetrators in their treatment of him. Further, we agree with the trial court that the limited evidence concerning Garcia's background and age at the time of the crime (21 years and nine months) does not demonstrate that he was immature, impetuous, vulnerable to outside pressure, or failed to appreciate risks and consequences.

For these reasons, reviewing the evidentiary hearing record in the light most favorable to the trial court's order, we conclude the record contains evidence that is reasonable, credible, and of solid value from which the trial court could find beyond a reasonable doubt that Garcia was a major participant in the underlying robbery and acted with reckless indifference to human life.

26

*B. Collateral Estoppel Claim*

Garcia contends the trial court erred in denying his petition "because the jury's inability to reach a finding on the robbery-murder special circumstance and the prosecution's subsequent failure to pursue that allegation constituted an effective dismissal that precludes the prosecution from now asserting Garcia was a major participant who acted with reckless indifference to human life. In essence, the prosecution is collaterally estopped from contesting the de facto adverse determination on the special-circumstance allegation."

The Attorney General counters that collateral estoppel does not apply to the jury's inability to reach a verdict and the prosecutor's decision not to pursue the special circumstance allegation further was not a decision on the merits in the prior proceeding.

Collateral estoppel is also known as issue preclusion. (*Strong*, *supra*, 13 Cal.5th at p. 715.) "This common law doctrine is 'grounded on the premise that "once an issue has been resolved in a prior proceeding, there is no further factfinding function to be performed." ' " (*Ibid.*; see also *People v. Catlin* (2001) 26 Cal.4th 81, 123–124.)

"In order for issue preclusion to apply, the following elements must be met: (1) the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding; (2) the issue must have been actually litigated in the former proceeding; (3) the issue must have been necessarily decided in the former proceeding; (4) the decision in the former proceeding must be final and on the merits; and (5) the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding." (*Williams v. Doctors Medical Center of Modesto, Inc.* (2024) 100 Cal.App.5th 1117, 1131–1132 (*Williams*) [citing, inter alia, *Strong*, *supra*, 13 Cal.5th at p. 716].) " 'Where there is doubt about the application of issue preclusion, it should not apply.' [Citations.] Stated differently, '[i]f "anything is left to conjecture as to what was necessarily involved and decided" there can be no collateral estoppel.' " (*Williams*, at p. 1132.) "And while these threshold requirements are necessary, they are not always

27

sufficient: 'Even if the[] threshold requirements are satisfied, the doctrine will not be applied if such application would not serve its underlying fundamental principles' of promoting efficiency while ensuring fairness to the parties. [Citations.] It is the burden of the party seeking to prevent relitigation based on prior findings to raise the defense and establish its elements." (*Strong*, at p. 716.)

"A lower court's application of issue preclusion is reviewed de novo." (*Williams*, *supra*, 100 Cal.App.5th at p. 1132.)

We are not persuaded that the jury's deadlock and the district attorney's failure to retry the robbery-murder special circumstance allegation amount to a decision on the merits of the special circumstance allegation. The deadlocked jury did not acquit Garcia of the special circumstance allegation. (*Yeager v. United States* (2009) 557 U.S. 110, 122 ["[T]he consideration of hung counts has no place in the issue-preclusion analysis. . . . To identify what a jury necessarily determined at trial, courts should scrutinize a jury's decisions, not its failures to decide."].) Further, the trial court record is silent on any further action taken with respect to the special circumstance allegation, and nothing in the record indicates that the prosecution failed to further pursue that allegation due to legal insufficiency of the evidence. Under these circumstances, we conclude that the failure to retry Garcia on the special circumstance allegation does not amount to a determination on the merits in Garcia's favor. (Cf. *People v. Nieber* (2022) 82 Cal.App.5th 458, 475 [rejecting an argument that a magistrate's dismissal of a special circumstance allegation operates as collateral estoppel and explaining that prosecution's failure to pursue the allegation further "d[id] not change the quality of the preliminary hearing decision"]; *People v. Hampton* (2022) 74 Cal.App.5th 1092, 1104–1106 [treating as equivalent to an acquittal a dismissal of a special circumstance allegation following trial on the People's motion for insufficient evidence]; see also *People v. Hatch* (2000) 22 Cal.4th 260, 274.)

28

## III. DISPOSITION

The February 6, 2023 order denying Garcia's petition for resentencing under Penal Code section 1172.6 is affirmed.

_____
Danner, J.

WE CONCUR:


_____
Bamattre-Manoukian, Acting P. J.




_____
Bromberg, J.




**H050818**
*People v. Garcia*